June 4. The Judges delivered their opinions.*
JUDGE CARR.
The Appellee sued the Appellant in As-sumpsit, on a contract for so much flour sold. The Declaration had several *counts, some special, some general. The Jury found a general verdict for the Plaintiff for $416 50, on which Judgment was rendered. On a subsequent day of the Term, the Counsel for the Defendant, with the consent of the opposing Counsel, tendered a Bill of Exceptions to sundry opinions of the Court, given on the trial. The Bill sets out at large what the evidence was intended to prove, and on this statement, several motions for instruction to the Jury are predicated. But one of them was the subject of discussion at the Bar, and to that I shall confine my remarks. The Court instructed the Jury, “that if they believed that the evidence adduced was true, and proved every fact which it purported to prove, and that the sale took place at five o’clock in the evening, (the only fact as to which there was any variance,) the Plaintiff had a right to recover in this action.” To enable us to judge of the correctness of this instruction, we must look into the evidence first, and then to the law of the case.
On the 20th March, 1820, the Appellee sold to the Appellant one hundred and forty-one barrels of fine flour, with certain mill brands on them, according to a list stating the number of barrels of each brand. The price was $3 50 cents per barrel. The flour was stored in the warehouse of J. & J. Pisher. The Plaintiff received from the Defendant a check on the Virginia Bank for the full amount of the price, and executed and delivered to the Defendant an order for the flour on the warehouse man. In the evening of the same day, the Plaintiff finding that he had mistaken the number of barrels, sent a corrected list to the Defendant, reducing the number to one hundred and nineteen barrels. Upon this, the order and check were given up, and a new contract made, by which the one hundred and nineteen barrels of flour, according to the list, were sold by the Plaintiff to the Defendant for the same price, amounting to $416 50 cents. For this sum the Defendant gave the Plaintiff a check on the Virginia Bank, and the Plaintiff gave a receipt in full, and an order for the flour. The *bill of parcels, (describing the flour very minutely,) and the receipt, are set out at large. This last agreement was made, (to say the latest,) about five o’clock in the evening. It is the usage of the Banks of Richmond, well known to merchants and others dealing with them, not to pay checks after 3 o’clock, P. M. At the time of the sale, the Plaintiff had in the same store-house about three hundred barrels superfine flour, and there were there also between two and three thousand barrels, belonging to others, of different qualities and brands, but none other but the Plaintiff’s with the same brands as the one hundred and nineteen barréis. At the time of giving the order for the flour, there was a considerable fall of rain, which continued till night. At the time of the sale the Plaintiff had in fact four more barrels of fine flour than he sold to the Defendant in the same house, and of the same brands, to wit: two of Rose’s and two of Pedlar’s brand. Except this, the list corresponded exactly with the fine flour which the Plaintiff had in Fishers’ store-house, both in number and brands. Between barrels of fine flour of the same brand, there is no difference in price. On the morning of the 21st March, the warehouse accidently took fire, and was burnt, together with the check for the price of the flour, and the flour itself; the one hundred and nineteen barrels having never been separated from the four barrels of the Plaintiff, nor the larger parcels belonging to others. The Defendant, on the same morning directed the Cashier not to pay the $416 50 cents. It is not the practice in Richmond for the keepers of storehouses to deliver flour in the rain, nor after dark; but, this flour, if it had been called for on that evening, would have been delivered, and it could have been done, the store-keeper said, in an hour. It" sometimes happens that flour, about tobe delivered, wants cooperage, in which case the usage, well known to merchants is, that the cooperage is done by the storer, at the expense of the vendor: sometimes forty barrels in one hundred will want coopering; sometimes not one. It has been, and is the usage of storers *in Richmond, well kno,wn to the merchants, to charge the vendor of the flour with the storage, and to deliver it to his order whenever called for. The storer in this case would have delivered any flour of the Plaintiff’s to his order, on demand, though the storage was not paid, holding him responsible, and charging him with it. It has been, and is the common course of trade in Richmond, for flour in store to be sold by draft or order on the store-keeper, and to pass, by the transfer of the order through many different hands, without actual delivery of the flour to any.
We are to consider whether, taking all these facts as proved to the satisfaction of the Jury, the Court properly instructed them, that the Plaintiff ought to recover in this action, remarking by the way, that the instruction touches no matter of fact, but matter of law solelj-; that it does not speak of the recovery, as to amount, or quantity, but merely as to the right: “that the Plaintiff, (if they believed the evidence) had a right to recover,” so that if he have a right to recover any part of his *760 demand, the Court was right, and it remained for the Jury to settle the amount. The great question is, to whom did the flour belong when burnt, for the owner must bear the loss. Was the contract so complete as to pass the property? We will consider this, first, upon the general principles which regulate contracts of sale; secondly, upon the usage found, that flour passes from hand to hand, by the transfer of the order, without the actual delivery of possession.
1st. To charge on a contract of sale, and put at the risk of the vendee, a constructive delivery is enough. An actuai delivery, neither in law, nor in fact, is required. It is only necessary that it be such as to pass the entire right of property. A symbolical delivery, as the key of a warehouse where the goods are deposited, will pass them to the vendee. 1 Atk. 171; 1 East. 195; 3 John. Rep. 395. So, if the contract of sale be complete, though the goods continue *in the warehouse where stored at the time of sale, under an agreement to be free of storage for a certain number of days, and during that time they be burnt, the vendee must bear the loss. Phillimore v. Barry, 1 Camp. 513. So, where the vendor has no further act to do, to ascertain the quantity, quality, or price of the article sold, the vendee must bear every loss by fire, &c. though he could not withdraw the goods from the place of deposit, because the duties were not paid, the fact that they were not paid being proclaimed at the sale, and vendor being in no default for the non-payment between the sale 'and burning. Hinde v. Whitehouse, 7 East. 558. But if by the terms of sale, there remains anything to be done by the vendor in order to render the goods deliverable, a loss subsequent to the sale, and prior to the doing of that act, must be borne by the vendor. If, therefore, weighing be necessary to ascertain the quantity, Hansom v. Meyer, 6 East. 614; or some casks remained to be filled up. to make them of one weight, Rugg v. Minett, 11 East. 210; or the contents of bales are to be counted, Zagury v. Firnell, 2 Camp. 240; or it be the duty of the vendor to do any other act, for ascertaining the quantity, quality, or price of the article, it is for such part as is not ascertained, at his risk, though the remainder will be at that of the purchaser. See Shepley v. Davis, 5 Taunt. 617; Busk v. Davis, 2 Mau. & Selw. 397, and many other cases. All these go upon the ground, that by the contract some essential act remained to be done by the vendor, as between vendor and vendee, to the completion of the contract, and whenever this is the case, the property does not pass, but remains in the vendor, and at his risk.
The doctrine of stoppage in transitu, must be cautiously applied to the case before us. It is established Eaw in England, that if goods be consigned to a merchant, and when they reach him he has become bankrupt, they go to his assignees, though the consignor should remain wholly unpaid, and though when he consigned them, he considered *his correspondents to be in good credit. The harshness and injustice of this principle is felt, and lamented by the Judges, and they go as far as they can in favor of an unpaid vendor. Thus, in Hammond v. Anderson, 4 Bos. & Pull. 70, Sir J. Mansfield, Ch. J. says, “the right of stopping in transitu is a favourable right, which the Courts of Eaw are always disposed to assist.” In Scott v. Pettit, 3 Bos. & Pull. 469, Eord Alvanley, who had tried the cause at H. P. says, “At the trial I could not help forming the wish, that the question, how far the bankruptcy of Beckley had operated as a countermand of his previous orders to Messrs. Wallers, should be considered by the Court. But in looking into the cases, I find that question to be completely closed in Westminster Hall, and that we therefore are bound to hold, that though a bankrupt has altogether ceased to be a trader, his warehouse continues open, for the purpose of receiving goods, and that the assignees have a right to take possession of every thing that may come into their hands, without paying a single farthing, even though the consignors of the goods are not entitled to come in under the commission.” And Heath, J. says, “It is much to be lamented', that goods consigned to a bankrupt, which arrive after the act of bankruptcy, as in this case, should ever be considered a part of the bankrupt’s effects. The hardship to which this rule of Eaw had given rise to, in particular cases, was the occasion of introducing the doctrine of stoppage in transitu.” It is not strange, that in their wish to restrict, and mitigate this harsh doctrine, the Judges should sometimes decide that goods are still in transitu, when, if the question were between two equally innocent, which should bear the loss, they would, under the same circumstances, have-decided that the possession was changed, and the vendee the owner. When the question of transit is decided against the unpaid vendor, we may safely take such a case as applying a fortiori to a question of mere risk.
*Let us now see how these general doctrines apply to our case. Two merchants in the City of Richmond come together; the one is a seller of flour, the other a buyer. The seller exposes his bill of parcels: here I have one hundred and nineteen barrels of fine flour,, lying in Fishers’ warehouse: these are the particular brands, and number of each brand : mv price is S3 50 per barrel, cash. The buyer says, I will take it. The amount is calculated, for which he gives a check on the Bank. The seller at the same time gives him a bill of parcels, an order on the warehouse man, and a receipt in full for the price of the flour. Is not this a complete, and executed contract? The money paid, and the flour delivered. That the check was made, and understood as a cash payment, none will doubt, who recollects that, since the institution of Banks, the merchants have used them as a place of deposit for their funds, and make all their money payments by checks on them. The receipt in full, too, shows that the seller at least thought that he had gotten his money. It would seem strange, if in return he did not give the flour. An actual, manual delivery *761 of it, was, from the nature of the article, not to be expected; but fair dealing required that something equivalent should be done, and the vendee would hardly have paid his money, without getting what he considered equal to an actual delivery: he got the order, directing the warehouse man to deliver him one hundred and nineteen barrels of fine flour of specified brands. Excluding all subsequent events from our view, and looking at this contract as the parties did at the moment of making it, can we doubt for an instant, that they considered it complete; that each party had done all that he had to do with it? And the intention of the parties, we know, is of the essence of contracts. This seems to me, the common sense, practical view of the subject, and it is fully supported by the Law. A bargain struck, and payment of the purchase money, vests the property of the chattel in the vendee. 2 Black. Com. 448. This was ^admitted in the case of a specific chattel, as a horse; but, the principle is applicable to every case where the subject of the bargain is so designated as to be clearly distinguishable. Thus, in Elude v. Whilehouse, Lord Ellenborough applies it to a sale of sugars at auction, which were af-terwards burnt. In support of his opinion, he cites with approbation, a passage from Noy’s Maxims, 88, where it is said, that “if I sell my horse for money, and the horse die in my stable between the bargain and delivery, I may have an action of debt for my money, because by the bargain, the property was in the buyer.” And it will be observed, that in this case, Lord Ellen-borough lays great stress on the meaning of the parties, and “what was considered between them.”
Phillimore v. Barry, 1 Camp. 513. This was a sale of rum, forming part of the cargo of a Danish prize, which was lodged in the warehouse of Fector & Minet, of Dover. The terms of sale, were a deposit of 25 per cent, to be paid immediately7, and the remainder in thirty day; at the end of that time, purchasers to take away the goods, or afterwards to pay warehouse rent. Thirteen puncheons of this rum, consisting of several lots, were bid for, and knocked down to an agent of the Defendants, for them. Before the thirty days elapsed, the warehouse caught fire, and by means of a quantity of gunpowder lodged in them, were blown into the air. There was no evidence of the deposit being paid. The action was brought by the seller, to recover the price of the rum. The first question was upon their Statute of Frauds, the 17th section of which requires a memorandum in writing, iri certain cases, in the sale of personal chattels, in this, differing from ours. Having discussed that point, Lord Ellenborough held, that the property vested absolutely in the purchasers, from the moment of the sale, and there was a verdict for the Plaintiff.
But it was contended, that the case before us falls within that class of cases, where something still remained to be done by the vendor to complete the contract, and therefore '*'that the property in the flour did not pass, and this something, it is said, was the cooperage, and the warehouse rent, both of which were chargeable to the vendor. But it must be remembered, that that which remains to be done, must be something essential to put the articles sold, in a deliverable state, and something, too, between vendor and vendee. As to the cooperage it does not appear that any was wanting in this case; and if it was, the usage proved is, that it was done by the storer, at the vendor’s expense. As to the warehouse rent, that formed no lien on the flour, for it is proved to be the usage, to charge it, (not upon the flour, but) to the vendor, and “to deliver the flour to his order when called for.” Neither of these things, then, show any thing farther to be done by the vendor, nor any obstacle existing to the delivery of the flour. The vendee had only to present his order to the warehouse-man, and the flour would have been rolled out to him, without a moment’s delay. The case of Austin v. Craven, 4 Taunt. 643, is not like this. That was Trover for fifty hogsheads of sugar, of a particular description, to be delivered on board a British ship. The action failed, because the Plaintiff could not prove that the Defendants (who were sugar refiners) ever had on hand the specified quantity and description of sugars sold: here it is in proof that every barrel of flour called for by the order was at the warehouse. Nor is this case like that of Busk v. Davis, 2 Mau. & Selw. 397. That was a sale of ten tons of Riga flax, lying at the Defendant’s wharf, at 1181. per ton : the flax was in mats, varying in quantity from three to five or six hundred weight. The quantity sold was to be ascertained by weighing by the wharfinger, and to make up ten tons might require the breaking of the flax mats. Before payment for the flax, the vendee became bankrupt, and the vendor sent an order to the Defendant, at whose wharf the flax still remained, not to deliver it. The assignees of the bankrupt brought Trover. Lord Ellenborough says, “The question in this case is, whether the property has been so ascertained *as to be considered in law as effectually delivered, the order to deliver having been given to the wharfingers, and entered on their hooks. That would not, of itself, be sufficient, unless the flax were in a deliverable state, and if farther acts were necessary to be done by the seller to make it so. Here it appears that farther acts were necessary; for, the flax was to be weighed, and the portion of the entire bulk to be delivered, was to be ascertained ; and if the weight of any number of unbroken mats was insufficient to satisfy the quantity agreed upon, it would ha.ve been necessary to break open some mats in order to make up that quantity. Therefore, it was impossible for the purchaser to say that any precise number of mats exclusively belonged to him.” Observe the striking difference between that case and ours. There, the flax was put up in mats, and sold by the ton : to make up the number of tons sold, it might be necessary to break up some of the mats. Here, the flour was put up in barrels, and sold by the barrel: no further process necessary, no weighing, *762 no barrel to be broken to make up the quantity. There, it was impossible for the buyer to say that any precise number of mats belonged to him. If he could have said so, the argument of the Chief Justice leads directly to the conclusion, that the decision would have been different. Here, the vendee could say what precise number of barrels belonged to him; his order designated number and brand, precisely.
But, I will now cite a case, which (if I mistake not strangely,) will remove the objection, that there was no such separation here, as would enable the vendee to designate any particular barrels as his property ; an objection founded on the fact, that there were in the warehouse, and belonging to Pendleton, two barrels of the Rose, and two of the Pedlar brand, which were not sold with the one hundred and nineteen. The case is Jackson v. Anderson, 4 Taunt. 24. Saddler, Jackson & Co. consigned to Fielding, residing at Buenos Ayres, good® to be sold for them. He sold the goods, and sent them an account of *the proceeds, calculated in dollars, and annexed to the following letter. “Gent: Annexed, I hand you an account of sales of four trunks, nett proceeds, 1,969 Spanish dollars, which amount I shall ship per the Cheerly, gun brig, Lieutenant Ful-larton, who will sail direct for England, in ten or fourteen days,” &c. Sometime afterwards, the Plaintiff received the following letter, brought by the ship Cheerly. ‘ ‘Gent: I have by this conveyance, sent to my friends, Messrs. Laycock & Co. a bill of lading for a barrel
J. F.
of dollars, marked-^— 100, in which are
P.
included for you, and on your account, $1,969, which sum will be rendered to you by said gentlemen,” &c. On the receipt of this letter, the Plaintiffs applied to Lay-cock & Co., and after being put off several times, were at length told, that they had transferred the bill of lading to a friend. On further enquiry, they found that the barrel of dollars, on its arrival, had been deposited in the Bank of England, and that the bill of lading, endorsed severally by Fielding, Laycock & Co., and the Defendants, had been transmitted to the Bullion Office by the Defendants, of whom the Bank had purchased the dollars, and paid them the sum of 1,0981. 13 9, being the value of $4,718, contained in the barrel, which sum the Defendants carried to the credit of Laycock & Co., with whom they had an account as Bankers. . Upon this, the Plaintiffs demanded the $1,969 of the Defendants, who refused to deliver them up, and thereupon they brought Trover for them. A verdict and Judgment at Nisi Prius, were taken for the Plaintiffs for 4181. 18 9, with leave to the Defendants to move to enter a nonsuit. In support of the motion, it was urged by Shepherd and Vaughan, Sergeants, that admitting the barrel, consigned to Laycock & Co., to be the same from which the $1,969 were intended to be appropriated to the Plaintiffs, still there has not been any such appropriation of them, as will entitle the Plaintiffs to this form of action. The objection, *they said is, that there has not been any act done in respect to the $1,969, claimed by the Plaintiffs to separate them from the rest, so as to enable the Plaintiffs to designate them as their own property; and when a demand was made,, by the Plaintiffs, of the dol'ars, if the Defendant had desired them to point out which dollars were their property, they could not possibly have ascertained them, which shows that neither Trover nor Det-inue will lie. This was the argument of eminent Counsel, and.it will be admitted that it was put in its most imposing form. What said the Court? Its opinion was delivered by Mansfield, Ch. J. After disposing of the other objection, he remarks, “Another question has arisen from the in-termixture of property. It appears that no-separation was ever made from the whole quantity of $1,969, belonging to the Plaintiff; and an objection has been taken one that ground against the form of the action. But, we think there is no difficulty in that point. The Defendant has disposed of all the dollars: consequently, he has disposed of those which belong to the Plaintiffs ; and as all are of the same value, it cannot be a question, what particular dollars were his. . It is not like the case of tenants in common, who have a right to a part of every grain of corn, &c. Here, one has a right to a certain number, and the other to the rest. If a man keeps all, and has no right to a part, the action lies for that part, which he wrongfully detains.” Now I ask, where is the difference with respect to separation between that case and this? If Trover could be maintained for $1,969, out of an undivided mass of $4,718, would not Trover equally lie for one hundred and nineteen barrels of flour out of one hundred and .twenty-three? The dollars were not more alike than barrels of the same quality and brand. The dollars in the one case were consigned to Laycock & Co., and the bill of lading endorsed, and delivered to them : in the other case," the barrels of flour were stored with the warehouse-man. In the one case, a letter is written to the Plaintiff, which is ‘‘considered as an order on the consignee for $1,969, out of a barrel containing $4,718: in the other, an order is given on the warehouseman for one hundred and nineteen barrels of flour, of particular marks and brands, out of one hundred and twenty-three. If Trover could be maintained for the dollars, could it not equally for the flour. It was asked, suppose a part of the flour had been burnt, how would you have decided whose it was? I ask, suppose a part of the dollars had been stolen out of the barrel, whose loss would it have been? The very same difficulty is presented, yet we see that in the case of the dollars, the Court did not perplex themselves with it, but going on the great principles of justice, sustained the claim of property. Observe, too, the ground taken; “As all (the dollars) are of the same value, it cannot be a question, what particular dollars were his.” In our case it is expressly in evidence, that between barrels of the same brand and quality, there is no difference in price. May we not say here then, “As all the barrels *763 ■were of the same value, it cannot be a question, what particular barrels were his?” Again, the Chief Justice says, “Here, one has a right to a particular number, and the other to the rest.” Did not the order in this case give the vendee a right to a particular number, one hundred and nineteen barrels? Yes; and the rest belonged to the vendor. Thus, I think I may fairly say, that leaving the custom out of the question, the case is with the Plaintiff.
But, surely, the custom puts it beyond all question. “An established usage (says Chief Justice Gibbs, in Lucas v. Dorrien, 2 Com. L. Rep. 105,) constitutes the common understanding of parties in their dealings, and on the foot of that common understanding, they are supposed to contract.” See also Doug. 513, what Lord Mansfield says of a custom, even one year old; and see Starkie’s Evid. pt. 4th, 452-3-4-5. The custom found is, that flour in store is sold by order, and passes by the transfer of the order, from hand to hand, without actual delivery of the *'flour to any.” Now, engraft this into the contract of the parties before us, and the question must be decided, unless you say that the parties could not make such a contract; that such an usage cannot stand. And why should we say so? There is nothing illegal in it. The principal foundation of Mercantile Daw is usage: and it has become Eaw, because the Courts, finding it established in practice, have respected it, and made it the rule of their decisions in mercantile cases. That this usage is convenient, is proved both by its existence, and the nature of the article. It saves the trouble to the merchant, of going twenty times a day to the different warehouses, to examine the different parcels of flour he had bought; for, under the usage, the order is a negotiable paper: the traders in flour look to the order only, and the flour passes by it from hand to hand: but, the character of the paper is changed at once, and the usage destroyed, if you say that however exactly it describes the flour, that flour shall not pass, if there be any other like it in the warehouse: the paper will no longer pass by its face, but before any buyer will pay his money, he will go to the warehouse with the bill of parcels, in his hand, and examine, not only to ascertain whether the flour described is there, but whetner there may not be in the warehouse other flour of the same brand and quality. And why should we, break up this usage, and impose this heavy clog on the commerce of the place? Especially, when in the case before us, it would have an ex post facto operation on the contract of the parlies. It cannot be denied that, under the usage, they intended an immediate change of ownership as to the flour, and consequently, that from the moment of such change, it should be at the risk of the vendee; but, after the flour is burnt, we say that the usage is a bad one, and shall not stand, and giving this decision a retrospective action, throw the loss upon the vendor.
To show the weight which the Courts give to mercantile usage, I will refer to the subject of dock warrants, treated of in the following cases: Spear v. Travers, 4 Camp. 251; *Zwinger v. Samuda, 2. Com. Law Rep. 98; Lucas v. Dorrien, 2 Com. Law Rep. 105; and Keyser v. Suse, 5 Com. Law Rep. 461.
But, suppose that in the teeth of tho contract, the usage and the cases cited, we say that no flour of Rose and Pedlar brands passed, because there were two barrels of each more than were sold. Still as regards the flour of the Bent Creek, Fredonian, Rocky Creek, D. S. Garland, and Rockford brands, we must say that passed by the order, because all in the warehouse, of those brands and quality, were contained in the order: (as in Rugg v. Minet, the Court decided that the property passed to the vendee, in all the casks that were filled up.) And if the property in any of the flour passed to the vendee, the vendor had a right to recover for so much, however small the quantity ; and the instruction of the Court which we are discussing, and upon which the whole turns, was not wrong, for, the Court instruct the Jury, that if they believe the evidence, the Plaintiff had a right to recover in this action, not pretending to speak as to the amount of the recovery, but as to the form of the action ; as to the law, not as to the facts.
Upon general principles, then, and also upon the usage, I am of opinion, that all the flour in the order passed by it to the vendee, and that he must bear the loss; but if only a part pas'sed, it is clear to me that the Court did not err in its instruction to the Jury. The Judgment must be affirmed.
JUDGE CABELL.
This was an action of Assumpsit, brought in the Superior Court Court of Law for the County of Henrico, by William G. Pendle-ton, against Gabriel Ralston and Archibald Pleasants, merchants and partners, trading under the firm of Ralston & Pleasants for $416 50, the price of one hundred and nineteen barrels of fine flour sold and delivered by Pendleton to Ralston & Pleasants. The suit ^abated as to Ralston, by the return of the Sheriff, and was afterwards prosecuted against Pleasants only. The contract of sale was not denied by Pleasants; but his defence was that it was an executory contract only, and not a sale executed by deliver.
That a delivery of the flour was necessary to make it an executed sale, is not denied. Nor is it pretended that there was an actual delivery. But a constructive delivery is as effectual as an actual delivery : And the question is, whether there has been such delivery in this case.
The contract was for the sale of one hundred and nineteen barrels of fine flour, of certain specified mill brands, which Pen-dleton then had stored in the warehouse of J. & J. Fisher, in the Ci1y of Richmond. The price was fixed at $3 50 per barrel, to be paid in hand, amounting in the whole to $416 50. Ralston & Pleasants, as soon as the contract was entered into, gave to-Pendleton their check on the Bank of Virginia, for the amount of the purchase money, and received from him a bill for the *764 flour, and an order on J. & J: Fisher, to deliver the flour to them. The order was in the following terms: “¿Messrs. John & James Fisher, junr., Gentlemen, Deliver to Messrs. Ralston & Pleasants, one hundred and nineteen barrels Richmond fine flour, which are stored with you, of the following brands, viz: Pedlar, 62 barrels; Rose, 2 barrels; Bent Creek, 7 barrels; Fredonian, 10 barrels; Rocky Creek, 20 barrels; David S. Garland, 13 barrels; Rockford, S barrels. Yr. mo. Win. G. Pendleton. Richmond, March 20, 1820.” Pendleton actually had, at the time of the .contract, in the warehouse of the Fishers, fine flour with which the order might have been strictly complied with. There was not, at that time, in the said warehouse, any fine flour of the specified brands, other than that which belonged to Pendleton ; nor had he there any fine flour <of the specified brands, beyond what the order called for, except that he had two more of “Pedlar” brand, and two more of “Rose” brand, than the order required. But *there is no difference whatever between barrels of fine flour of the same mill brand. “It is the common usage of trade in the City of Richmond, well known to the merchants thereof, for flour in store to be sold by draft or order on the storekeeper, and to pass by that mode of transfer, through many different hands, without actual delivery.” The storage due for the flour in this case, was not paid by Pendle-ton, but “it is the usage of the store-housekeepers in the City of Richmond, well known to the merchants, to charge the vendor with the storage, and to deliver the flour to his order, when called for;” and it is proved in this case, that the flour would have been delivered, on the day of sale, had it been called for, notwithstanding the storage had not been paid. It sometimes happens that flour, when about to be delivered, is found to require coopering; but in such cases, it is the usage in the City of Richmond, well known to the merchants,' for the cooperage to be done by the store, at the expense of the vendor.
It was insisted, by the Counsel for the Appellant, that there can be no constructive delivery, where any thing remains to be done, as between the vendor and vendee, to put the property into a deliverable condition. And it must be conceded that the cases referred to by him, fully established the principle. I will, however, take a hasty view of them, in order to show that the circumstances of those cases, are materially different from this case.
In Hanson v. Meyer, 6 Fast. 614, there was a sale of all a man’s starch, at a certain warehouse, at so much per cent., and it was held that the same was not complete to pass the property, because the starch remained to be weighed, before even the price could be ascertained.
In Wallace v. Breeds, 13 East 522, there was a sale of fifty out of ninety tons of Greenland oil, which was in casks. It was held, that the property did not pass, because, according to the constant custom of the trade, the casks were to be searched by a cooper employed by the vendor; a broker, also, on behalf of both the vendor and *vendee, was to attend and make a minute of the foot-dirt and water in each cask ; and the casks were then to be filled up by the seller’s cooper, and at his expense, so that they might be delivered in a complete state, containing the quantity sold.
In Austen v. Craven, 4 Taunt. 644, there was a sale of fifty hogsheads of sugar, of a certain quality, at so much per cwt. There were no hogsheads of such sugar in existence at the time of the contract. The hogsheads were to be filled and then weighed, before even the price could be ascertained. Held that the sale was not complete.
In Busk v. Davis, 2 Mau. & Selw. 397, there was a sale of ten tons out of eighteen tons of Riga flax, then lying at a certain wharf. The flax was in mats of different weights. It remained to weigh the flax, before it could be in a situation to be delivered ; and it would be necessary to break some of the mats to make up the precise quantity sold. I say nothing at present, as to the right of the vendor to select the mats to be delivered. It was held that the sale was not complete, so as to pass the property.
In Shepley v. Davis, 5 Taunt. 617; 1 Com. Law Rep. 211, there was a sale of ten tons out of thirty tons of hemp, at a war-finger’s. It remained to weigh the ten tons from the general mass, before they could be delivered. Held, that the sale was not complete, so as to pass the property.
In White v. Wilks, 5 Taunt. 176; 1 Com. Law Rep. 64, there was a sale of twenty tons of oil, out of a merchant’s stock, consisting of several large quantities of oil, in divers cisterns, and in divers places. It remained to measure from the larger masses, the twenty tons sold, before they could be in a situation to be delivered. Here, also, I say nothing at present, as to what cisterns the twenty tons should be taken from. This sale was held not to be complete, to pass the property.
Thus, in some of these cases, it remained to ascertain even the price of the things sold; and in all of them, it remained to measure or to weigh the thing sold, before it ’’could be delivered. In the case at Bar, nothing remained to be done for ascertaining the price or amount of purchase money; that was fixed by the terms of the contract itself; and the thing sold required neither to be weighed nor measured,
But, it is contended, that this case resembles Wallace v. Breeds, and comes within the influence of the general principle as to the thing sold not being in a deliverable situation, because the flour might require some coopering. But, in Wallace v. Breeds, it was certain at the time of the sale, that the thing sold was not then in a situation to be delivered; it was certain that it required the agency of a cooper to put it into that state; and the cooper was to be selected by the vendor. In this case, no agency of a cooper may have been necessary. It is only sometimes, that flour in store, requires any coopering; and when it does, the cooper is not then to be selected by the vendor; for, the usage *765 of the trade, and consequently the implied contract of the parties, provides that the coopering, when any is necessary, shail be done by the -warehouse-man, without any farther act to be done as between vendor and vendee. The coopering, under this usage, ought not to be considered as an act necessary to complete the sale, but merely as an act to be done, at the convenience and at the future request of the vendee. It is to the interest of the vendees that it should never be done till the flour is actually called for. And the acts of the parties in this case would seem to show that they so considered it. Ralston & Pleasants gave their check for the purchase money, (intending it as full payment,) in the same manner as if the sale were complete; and Pendleton insisted on no stipulation, fixing the time for delivering the flour, which he probably would have done, had it been considered that the flour was yet to be delivered. and that, in the mean time, it was at his risk.
But it is contended, that the properly did not pass by the sale in this case, because the specific flour sold was not '"ascertained as to identity and individuality, by an actual separation of it from the other flour with which it was mixed in the warehouse. This objection cannot, I presume, be intended to apply to any of the flour sold, except to that of the Pedlar and Rose brands. As to all the flour of the other brands, there was no other flour of those kinds in the warehouse, except the precise numbers mentioned in the order. Consequently, their identity and individuality were as fully ascertained as if they had been actually delivered. The objection, however, does apply to the flour of the Pedlar and Rose brands, there being two barrels of each of those brands more than the numbers called for in the order. And the question is, whether that circumstance shall prevent the sale from passing the property in the flour of those brands. It is true, that Chief Justice Mansfield said in Austen v. Craven, and in White v. Wilks, that the actions could not be supported, because the contracts of sale under which the property was claimed, attached to no specific quantity of oil in the one case, or of sugar in the other. And in Busk v. Davis, Lord EUenborough, and some of the other Judges, spoke of the necessity of ascertaining the identity and individuality of the property. But it should always be borne in mind, that the expressions of Judges must be construed in reference to the circumstances of the cases to which they are applied. Austen v. Craven, was the sale of fifty hogsheads of sugar, of a particular quality, which were not in existence at the time of the contract: and if they' had been in existence, yet as hogsheads of sugar are of no prescribed weight, it would have been necessary to weigh them, before the sale would be complete. White v. Wilks, was the sale of a smaller portion of oil, out of divers larger quantities. It was not only uncertain from which of the larger quantities the portion sold was to be taken, but if they had been ascertained, still the part sold was to be separated by measuring it from the larger quantity with which it was mixed. Busk v. Davis, was the sale of a quantity of flax, out of a much '"'larger quantity, lying in mats, at a certain wharf. The sale was for so many tons, not so many mats; besides, the mats were of unequal weights. It was necessary to weigh the quantity sold, and to break some of the mats, to get the precise quantity sold, before the article sold could be delivered. In cases like these, where portions of a larger mass, liquid or solid, are sold, and where the portions sold must be weighed or measured, (which, of necessity, includes the idea of separating them from the general mass,) it may be said that the identity and individuality of the part sold, must be ascertained by actual separation from its kindred residue, before the sale will be complete to pass the property; or, in other words, before there can be a constructive delivery. But it by no means follows, that the same principle applies to cases where the things sold are not portions of a larger mass, to be separated by weighing or measuring, but consist of divers separate and individual things, all precisely of the same kind and value, mixed with divers other separate and individual things, which are also of the same kind and value, and between which and the things sold, there is no manner of difference whatever. There is no case of this kind to which the principle has been applied. On the contrary, it has been decided, that in such cases, no actual separation is necessary, even to support the action of Trover. Thus, in Jackson, and another v. Anderson, 4 Taunt. 24, J. Fielding, in Buenos Ayres, put 4,718 Spanish milled dollars into a barrel, and consigned them to Laycock & Co., of London, with directions to deliver 1,969 of them to Jackson & Co., that being the sum in which Fielding was indebted to them for goods consigned by them to him, and sold on thetr account. Laycock & Co. did not deliver the 1,969 dollars to Jackson & Co., but assigned the bill of lading for the barrel of dollars to Anderson, who sold all the dollars to the Bank of England. Jackson & Co. brought Trover against Anderson, for the 1,969 dollars. The defence was precisely the same that was made in Austen v. Craven, *White v. Wilks, and Busk v. Davis, viz: that the action of Trover would He only for specific property, and that the identity and individuality of the dollars sued for, had never been ascertained by actual separation from the others with which they were mixed. The defence, however, was overruled, and the Plaintiff obtained Judgment, on the ground expressly stated by Chief Justice Mansfield, “that as all the dollars were of the same value, it could not be a question which particular dollars were his.” This remark applies to, and is decisive of, the case before us; for, it is expressly stated in the Record, that between barrels of fine flour, of the same mill brand, there is no difference whatever. Nor is it material that the property, in the case of Jackson v. Craven, was claimed under a bill of lading, and in the other cases, under •a contract of sale. The action was Trover in all the cases, and there was no greater *766 necessity for showing the identity and in-di viduality of the property in the one set -of cases, than in the other; yet the action was supported in the case where the things sued for were individual things of the -same value, mixed with others of the same kind and value; and was not supported, where the action was not for individual things of the same kind, but for a portion of a larger mass, liquid or compound, which requires to be weighed or measured.
It is farther contended for the Appellant, that it was necessary to count the barrels before they could be delivered, and that the sale could not be complete to pass the property, until they were counted. But, I have not found any adjudication which countenances the idea, that the necessity to count the things sold, will produce that effect, in cases where the things sold are individual things, of the same value with each other, and with those with which they are mixed, and where the counting is not necessary for ascertaining the amount of the purchase money. In the case before us, the things sold were individual things, of the same value, so far at least as relates to the flour of the same brand; and no counting was necessary for ascertaining *the amount of the purchase money; that was fixed by the terms of the contract itself. The barrels, it is true, were to be counted. But so they must be in cases where a certain number is sold, at an agreed price, and where there are no more in the warehouse than the number sold. But, in such cases they are counted, merely to see that they are in the warehouse, And it would not be contended, I presume, that the necessity for counting in such cases, would prevent the property from passing. I admit, that if the sale had not specified the number of barrels, but had been of all the flour in the warehouse, ■or of all the flour of any particular brand, at so much per barrel, such a sale would not pass the property, until the barrels were counted; because, the counting would be necessary in that case for ascertaining the amount of the purchase money; and no sale can be complete till that is ascertained.
I am of opinion, that the usage of trade, stated in the Record, for flour in store to be sold by mere draft or order on the warehouse man, and to pass through many hands before it is called for, is entitled to great consideration. For, Commercial Law rests principally on usage; and the usages of trade are presumed to enter into the contemplation of the parties to a contract, and they are supposed to contract on their basis.
Upon the whole, I am of opinion, that there was a constructive delivery of the flour, which completed and executed the sale, and passed the right of property to Ralston & Pleasants. The flour therefore being theirs, was at their risk, and the loss of it by the accidental burning of the warehouse, must fall on them, and not on Pendleton. And as the check was given on the Bank of Virginia for the purchase money, did not avail Pendleton asa payment, (the check itself having been consumed by fire, and the payment of it countermanded by Ral-ston & Pleasants,) I think Pendleton is entitled to recover the purchase money in this action, and that the Judgment should be affirmed.
*The PRESIDENT.
In considering this case, I have examined all the cases cited at the Bar, and also some others that were not noticed. It is a settled rule of the Common Law, that property in personal chattels passes only by actual delivery of the thing, except in cases in which some equivalent delivery is agreed upon by the parties, or is established by custom or usage, in which a virtual delivery is substituted for actual delivery of the thing. But, in these cases, uuless the thing was in a condition to be delivered without more to be done by the vendor, either as regarded the price, or the quantity, as there could be no actual' delivery until that was done by the vendor, so there can be no virtual delivery equivalent to it. And all the cases on the subject appear to me to have turned on the enquiry, whether, from the nature of the subject, it wa.s, or was not, in a deliverable condition, that is, without more to be done by the vendor affecting the price or the quantity of the thing to be delivered. From some of the cases, it might be inferred, that identity of the thing was a pre-requisite toa virtual delivery of it; and I think there can be no doubt it is so, in every case in which the price or quantity is to be affected by what remains to be done to ascertain it. But, in a case in which identity is a matter of total indifference, both to the vendor and vendee, either as regards price or quantity, it is certainly of no importance. It is impossible to suppose, upon the facts stated in the Bill of Exceptions, that if Pendleton, the vendor, had separated the one hundred and nineteen barrels of flour from the one hundred and twenty-three, in pursuance of the terms of the order; that when he came to those of Pedlar’s brand, or Rose’s, it was of the slightest importance to him, or to the vendors, which two barrels of each brand were left out, as exceeding the number stated in the order. All of the same brand being of equal value, and being integral quantities, they were in a deliverable condition, without more to be done by the vendor, “’which could affect either price or quantity. Every thing necessary to be done, to give to the ven-dees the actual possession of the flour, could be done by the keeper of the warehouse as well as by Pendleton, and the order under the custom, which is stated in the Bill of Exceptions, I think, virtually passed the possession of the one hundred and nineteen barrels to the vendees. The case of Whitehouse v. Frost, 12 East. 614, went a step farther than this. In that case, ten tons of oil were sold, and an order given to deliver it to the purchasers, out of forty tons then lying in one cistern in the oil-house in Liverpool; there was nothing to distinguish the ten tons from any other ten tons of the forty in the cistern; there was nothing like identity; quantity and price were alone ascertained ; all the particles of the oil were mingled together in one mass; there were no integral quantL *767 ties of equal value, distinct and separate from the whole mass, of which actual or virtual delivery might be made; until the oil was measured out, and the ten tons separated from the mass, this could not be •predicated of it, and yet the Court held that the property passed to the vendees. I know that this case was condemned by many of the Judges afterwards, as having gone too Ear; but it is clearly distinguishable from the one before u&. When that case was pressed upon the Court in the case of Craven v. Austin, 4 Taunt., Heth, Justice, asked, if ten tons had leaked out of the cistern, to whom would they be deemed to belong: and Mansfield, Chief Justice, in delivering the opinion of the Court, said it was unlike other cases, and must stand on its own bottom.
In the case of Busk v. Davis, 2 Mau. & Selw. ten tons of flax were sold, to be taken out of eighteen tons put up in mats; the •order for it had been accepted and entered in the wharfinger’s books, but that, Lord Ellenborough said, was not sufficient: further acts were necessary, for the flax was to be weighed, and the portion of the •entire bulk to be delivered, was to be ascertained, and it might be necessary to break open some mats to make up the quantity ^agreed upon. If in that case the flax had been in mats of equal quantity, and value, the first ascer-, tamed by the inspection of a public officer, aiK! the latter by the facts in the case, as in the case of the flour, it is not to be inferred from the language of Lord Ellen-borough, or any other Judge, that it would have been held that the property did not pass; but the contrary. The case of Jackson and another v. Anderson and another, 4 Taunt, is a case, in which identity of the thing, in which property was claimed by the Plaintiffs, was not pretended. The 1,959 dollars consigned to Jackson & Co. by Fielding, the shipper, were never separated from, nor counted out from the 4,718 dollars shipped to Laycock & Co. and transferred by them to Anderson, and yet it was held that the properly in the 1,969 dollars passed to Jackson & Co. the Plaintifis, and that they could maintain Trover for them. They were separate quantities of the same value, and were as little distinguishable from other dollars in the same barrel, as the sixty-two barrels of flour •of Pedlar’s brand, and the two barrels of Rose’s brand, from what would remain if those brands, in the case before us. In that case, they held that the property passed, though the bill of lading would have been satisfied by the delivery of any dollars to the amount of 1,969. and property in any specific 1,969 dollars could not be said to be vested in the Plaintiffs. The order for the flour, in our case, could not have been satisfied by the delivery of any flour, even of the same inspections, and brands, except that which was in the warehouse when that order was given; from that moment, the one hundred and nineteen barrels of fine flour, of the marks and brands specified in the order, became the property of the vendees: all that was material to them was, that the flour described in the order was in the warehouse, to be counted out to them when called for. If the vendor had not owned another barrel there except the one hundred and nineteen barrels specified in the order, it could not be doubted that his property in the one hundred and nineteen barrels passed *to the vendees though itmig'ht be to be counted out of flour of the same description, belonging to others. As it had not been questioned that the flour of all the brands described in the order, except Pedlar’s and Rose’s, passed to the vendees, that sixty-two barrels of the first, and two of the latter were to be counted out of sixty-four in the one case, and four in the other, cannot vary the case: whether it was to be counted out of flour belonging to others or to the vendor, was not material. The rule, I know, has been laid down, that where any thing remains to be done to ascertain the price, the quantity, or the thing, the property does not pass. In the case before us, price and quantity were ascertained; and as to the thing, nothing more is meant than the kind of thing, wherever from the nature of it, it cannot be identified, and distinguished from things of the same kind and value, as in the case of the dollars in Jackson v. Anderson, and of the flour in the case before us.
With regard to the cooperage, which might not be necessary, and the price of storage, as it was the custom to charge both to the vendor, neither can affect the question.
I think, therefore, that the instruction of the Judge to the Jury was correct, and that the Judgment must be affirmed.

Judges Coaltisb and Gkeen, absent.